*TUCKRR, Judge.
The case, as it may be collected from different parts of the record, appears to be as follows :
Robert Carter, of Nomony, being possessed of a large estate in Doudoun county, employed James Dane as his agent or steward, with authority to collect the rents, and contract for leases, &c. The leases appear to have been usually for three lives, with covenants on the part of the lessees for certain improvements, and a clause in restraint of alienation, without license from Carter.
February 25th, 1767, William Musgrove took the lot in question for three lives, as appears by a memorandum in the hand writing of James Dane, of that date, signed by him. Musgrove dying in December 1777, application was made by Nathaniel Smith, his administrator, for a lease pursuant to that memorandum. Robert Carter made the following endorsement on Dane’s certificate, “No. 1, No. 4, J. Dane’s certificate, good.”
By this endorsement, Iconceive, was meant, that the lease promised to William Musgrove, to whom Carter appears to have thought that the right to the lease descended as heir to his father, for the lives of the said John Mus-grove and Valender Musgrove, William, the third person whose name was to have been inserted in the lease being now dead. No lease, however, appears to have been made, nor any further application to Mr. Carter on the subject. In this state matters remained until August 14th, 1789, when upon a compromise of a suit brought by Charles Carter for the above estate, Robert Carter made him a deed for one moiety, including the lot in question. Smith, in behalf of William Mus-grove’s estate, appears to have paid the rents regularly to Robert Carter’s agent, the last receipt bearing date in August 1790.
John Musgrove, having come of age, sold the lot in question to Roberts, the complainant in chancery, and executed a deed for it September 23d, 1791 ; Smith, at the time of the sale, having given him all the information he possessed relative to the title.
*August 11th, 1791, Mr. Pendleton being about to levy an elegit on this estate, constituted Thomas Pollard his agent to negotiate the levying of the same, with full power and directions to receive the attornments of the tenants to him ; and to receive and give acquittances for their rents, as they should, from time to time, become due, engaging to confirm whatever he should do in the premises. Two writs of elegit were executed in September 1791 ; and, in September 1793, a third was executed, which included the lot in question, then occupied by the complainant Roberts. Pollard states, in his deposition, that he received the rents from the several tenants (making no exception) for the years 1791, 1792, 1793, 1794 ; and Mr. Pendleton, in his letter of February 6th, 1794, requests him to continue receiving the rents, until a proposition made by Charles Carter, to him, to sell as much of the land as would pay off his debt should be completed.
December 18th, 1794, Joseph Jones, the appellant, having notice of the service of the three elegits, purchased the whole estate of Charles Carter, subject to the same ; and, on the 31st of March, 1795, Mr. Jones, for the consideration of ¿"1240, obtained from Mr. Pendleton a release of his claim under the several writs of elegit.
It is expressly charged in the bill, and put in issue, that Mr. Jones, before his purchase, went over the lands; knew that the complainant was in possession of the lot; often conversed with him about the estate, knowing him to be a tenant thereon ; had heard of the claims set up by the tenants ; and he is expressly interrogated, what he knew, or what he had heard of the claim and possession of the complainant before his purchase from Charles Carter ? To these charges and interrogatories, he pointedly answers : That he is a stranger to the transactions between Robert and Charles Carter, previous to his purchase: that he does not recollect that Charles Carter consulted with him, or made any other communication respecting his claim or title to the lands, than might have been made to any indifferent person : that with respect *to what he had heard or been informed respecting the tenants’ rights before he purchased, he always understood, from Charles Carter, that after he acquired a title to the land, he found some of the tenants had no leases, or other pre-tence to continue on the land, than that of promises as they said from Robert Carter, or his collectors ; and wanting the land to cultivate himself, he had demanded possession, but they refused to yield it under pretext of such promises from Robert Carter, or his agents : and that he should have proceeded to eject them, but from a conviction that he should soon be compelled to part with the *1127 land. He also states that, after the purchase made by himself, he evicted the tenants ; and requested information on what terms they held their tenements, when he discovered that the complainant had no lease for the lot in question, or at least produced none to him. That to ascertain the fact, he examined the records of Loudoun and Fairfax, and could find none. That, finding- several other tenements in the same situation, he informed those tenants, that unless they would give up their lots, or come upon terms with him for renting them, he would have ejectments served to obtain the possession, which the complainant refused to do, relying on his right to hold the land on a promise from Robert Carter, or some agent or collector of his. That he was unacquainted with the terms on which the tenants respectively held their tenements, until after he had purchased the land, and the above investigation took place. This answer is not contradicted, or disproved in any part of the record, that I have discovered.
That John Musgrove, the son of William, (or Smith, his administrator,) had an equitable title to a lease from Robert Carter, for the lives of himself and Yalender Musgrove, is, I think, fully proved by the answer of Robert Carter, the deposition of Nathaniel Smith, and that of Benjamin Dawson ; and that, until January 1788, when John Musgrove came of age, no laches is imputable to him, for not taking some steps to procure a legal title to such a term. But, from that period, it is imputable to him ; for, in agreements *of this kind, both parties are agents. It was, therefore, equally incumbent upon John Musgrove to demand a lease, as upon Robert Carter to tender one. Eighteen months elapsed before Charles Carter became the purchaser ; and, in all that time, nothing was done by Musgrove towards obtaining a lease. He does not even appear to have given Charles Carter notice of his claim ; but, in September 1791, three years and a half after he came of age, and two years after Charles Carter had purchased the land, without any communication with, or license from him, he sells the lot to the complainant Roberts, puts him in possession, and makes him a deed ; which is found among the exhibits, reciting the nature of Musgrove’s claim, and must have given the complainant full notice, if notice had not also been proved by Nathaniel Smith, in his first deposition. Roberts then was a purchaser with full notice of the nature of Musgrove’s title. Now, although Musgrove had an indubitable claim upon Robert Carter for a lease, when he came of age to demand it, it was a mere equitable title that he had to one ; and that subject to all the covenants and conditions, which it was mutually understood between William Musgrove, the father, and Lane, the agent of Robert Carter, were usually inserted in the leases which he granted. Among them there was a covenant or condition against alienation without license, by which condition, William Musgrove, and after his death, John Musgrove, his son, were equally bound in equity, as Robert Carter was to grant the lease for the three lives. Roberts had, or must be presumed to have had, full notice of all this when he bought the lot, and took an assignment of John’s right. John Musgrove then engages to give every assistance in his power to Roberts towards obtaining a lease. Why did not Roberts apply to Charles Carter for a lease, during the two years that intervened between his taking this assignment, and the levying the elegit upon the lands ? And why did he not apply, or make known his claim, either to Charles Carter, or Mr. Pendleton for eighteen months after ; and before Mr. Jones had become a purchaser from Carter, *and a little longer period before he purchased the right of the tenant by elegit ? Lastly, why did he not shew the deed of assignment from Mus-grove to Mr. Jones, when requested to communicate his title ; but, on the contrary, why did he studiously and mysteriously conceal ít ? Was it, that he might drive him to bring an ejectment; and when he had got a judgment against him for his land, conjure up this dormant equity, the evidence of which had slept for near twenty years, for the purpose of saddling him with the whole expense of a suit at law, and another in equity 7 This wilful concealment on his part, in my opinion, ought not to operate to his advantage, and to the vexation, delay and injury of a person pursuing his legal rights, without knowledge of this dormant equity, and without the possibility of discovering it by his own researches and exertions. No fraud, collusion, neglect, or other fault whatsoever, is imputable to Mr. Jones, in the whole transaction, yet (if I understand the course in the court of chancery, although not so expressed, or even noticed in the decree) may be condemned to pay the costs of both suits. The rule caveat emptor applies to legal, not to latent, and much less, to wilfully concealed equitable rights. 1 Wash. 217, 338, 339. Had the complainant made known the nature of his claim to the defendant, when he desired it, and proposed to come upon terms, all the trouble, expense and delay, which have ensued from his refusal, would probably have been avoided. By defending his title at law, instead of acceding to so reasonable a proposal, or at once bringing his bill for a lease, I conceive, he is not entitled at this day to the aid of a court of equity, his own conduct throughout being a direct violation of its rules.
But this is not the only ground upon which I think Roberts not entitled to the aid of a court of equity. Being the purchaser of an equitable title only, with full, or at least strong presumptive notice, that the tenant was restrained from alienation without license, no equivocal act of a fair purchaser, for a valuable consideration, of the fee simple estate, not having notice of the nature of his title, ought to *have any effect upon his case, unless it shall appear to the satisfaction of the court that such act could not have been done diverso intuitu, from that which is contended for. The acceptance of rent from the alienee, or assignee of a tenant, who is restrained from alienation without license, is one of those equivocal acts which may, or may not, amount to a recognition of his title, and a waiver of the forfeiture, according to circumstances. Roberts purchased at the very time that Mr. Pendleton sued out his first and second writs of elegit; and, although neither of these writs was levied upon the lot in *1128 question, it no where appears that he ever paid any rent to Charles Carter, nor indeed to Mr. Pendleton. All the receipts taken up to the 21st of February, 1795, which was after Jones’s purchase from Charles Carter, being in the name of Nathaniel Smith, who, as administrator of William Musgrove, had paid them for the space of nearly one and twenty years before: the first receipt to him bearing date March 13, 1774. The acceptance of rent by Mr. Jones himself (is stated in the bill, and, therefore, need not be proved on his part) was on a condition that it should not affect his title. Cowp. 245. The presumption that the rent was accepted from Roberts, with full notice of the nature of his title, is thus completely done away, and having gained a possession, contrary to the equitable condition annexed to Musgrove’s title, of which he must be presumed to have had full notice, he is to be regarded as a mere tenant at sufferance, or, at most, as a tenant at will. In neither of these characters could he have any pretensions to a lease from the appellant. But his possession has been relied on as sufficient notice to the purchaser that he must take the land with peril in equity of every right which the holder can assert against the seller. To this it is enough to answer, that every person who occupies the land of another, as a tenant, is, in law, a tenant at will, unless he can shew a lease whereby his term is rendered certain. I have already shewn that the purchaser made every enquiry and scrutiny which a knowledge of that possession would have *led to. And, to me it appears, that Roberts’s equity, be it what it might, would have been, and was, destroyed by his subsequent conduct to the appellant, for the- reasons already mentioned.
A further reason why Roberts appears to me not to be entitled to the aid of a court of equity, arises from this circumstance. If he was entitled to a lease at all, it was such a one as the chancellor has directed to be made, with covenants as in Roberts’s lease to Henry Taylor. I have before said, that John Musgrove, and I will now add all who claim under him, were in equity equally bound by the terms and covenants which were to have been contained in the lease, as .they would have been at law, if the lease had been executed by both parties, and recorded. Among the covenants, contained in Taylor’s lease, one was, that the lessee should within three years from the date of the lease, build thereon a good dwelling house, of certain dimensions, another house of certain dimensions, as good as common tobacco houses, and plant fifty apple trees, and fifty peach trees, enclose the same with a lawful fence, and at all times during the term, well and sufficiently maintain and keep all and singular the messuages, buildings, fences, &c. in good and sufficient repair. Another covenant is, that the tenant should not, without license in writing, work more than four labouring hands; nor commit, or suffer, any waste : nor sell or dispose of the premises without license, or suffer any wood, or timber, thereon, to be disposed of otherwise than for the buildings, fences and necessary use of the plantation : and finally that, in lieu of a breach, or failure of any part of the above covenants, the lessor, his heirs and assigns, might re-enter, and hold the land, as if that deed had never been made.
Equity, considering that as done which ought to have been done, will refer the commencement of the lease to the time when Robert Carter made the promise to Smith to grant a lease to John Musgrove for the two remaining lives. Although it should be contended that the infancy of John Musgrove should protect him from forfeiture on account of *the non-performance of the covenants upon his part, yet his infancy expired, as I have noticed before, in January 1788. From that period his infancy could be no protection. Roberts purchased in September 1791, three years and a half after John Musgrove came of age, six months after the time when the improvements ought to have been made, supposing John Musgrove’s lease to have been dated the day he came of age. Two years and a half more elapsed before Jones’s purchase from Charles Carter, and from Mr. Pendle-ton, was finally completed. In his answer, by way of defensive allegation, and as a reason why he should not be compelled to make a lease according to the prayer of the bill, he states, “that there are no improvements on the lot in dispute, such as required by the leases, and the land very much cleared and abused.” The fact, thus put in issue, goes to the full denial of the plaintiff’s equity. The depositions of John Taylor, Nathaniel Smith, Thomas Pollard and Daniel Ficklin, establish the fact, beyond the possibility of a doubt, there being no conflicting testimony with respect to it. It is a principle in equity, that he who demands the execution of an agreement, ought to shew that there has been no default in him, in performing all that was to be done on his part. For, if either he will not, or, through his negligence, cannot, perform the whole on his side, he has no title in equity, to the performance of the other party, since such performance could not be mutual : Nor will equity decree a specific performance in his favour, especially if circumstances are altered. 1 Fonbl. 391, 392. To say nothing of the non-performance of the covenants respecting buildings, orchards, and keeping the premises in repair, what compensation can Roberts now make for the waste and destruction which it is there proved that he has committed ? Will equity decree in favour of "a party who comes into its courts with such unclean hands ? Will it declare that the appellant was not equally entitled to the benefit of the covenants intended to have been comprised in the lease, as the ap-pellee? And if so, will it relieve the appellee against a judgment obtained *at law, which, for aught that appears to the contrary, the appellant might have been entitled to, although Robert Carter, Charles Carter, or Edmund Pendle-ton, had sealed the lease which the court of chancery has directed the appellant to execute ? I think not; and for all these reasons, I am for reversing the decree, and dissolving the injunction.
ROANE, Judge.
This case, considered independently of any unauthorized acts of commission or omission, in relation to the promises, on the part of the appellee, or those under whom he claims, and supposing the *1129 legal title acquired by Mr. Jones to be out of the case, would be very strong in favour of the appellee. I should, in that view, probably get over the objection that the particulars of the title of the appellant are not set out and deduced in the bill: Nor should I have much doubt but that the case of the appellee, (taking Taylor’s lease as a model, and founding a construction upon the whole instrument,) would justify the title and entry of .William Musgrove’s heir, from whom the appellant claims. The case, however, as it is, and considered in relation to Jones, lies within a narrow compass ; and I shall not, therefore, enter particularly upon the above topics.
It cannot be doubted, but that Musgrove’s lease, had it been obtained, would have contained stipulations on his part for the building and repairs of houses, and the planting of orchards ; as also for the keeping a limited number of hands on the premises, and against the destruction and carrying away of timber, <&c. Considered as a lease for lives, which might at any time expire, the former stipulations ought to have been forthwith performed, else there might have been no houses nor orchards on the premises for the next tenant; and thus a beneficial lease to others might have been prevented; and the covenants of the latter class, if broken, inflicted a lasting damage upon the inheritance.
On the testimony, none of these stipulations have been complied with ; and yet the appellee has to contend against *a legal title. It is supposed, that a cause of forfeiture in the premises, incurred by those under whom Roberts claims, and not waived by some act of Jones, or those under whom he claims, would bind Roberts, as much as one committed by himself, and in the time of the present appellant. But it is shewn in evidence in addition, that there is not only a neglect to build, and plant orchards, and keep them in repair, by Roberts, after Jones’s title accrued, and up to the present time, but also that Roberts himself burnt coal and carried it off the premises. This, (to say nothing of the injuries committed on the land by extensive clearings,) was long after any of those acts of Robert Carter or Charles Carter, which have been relied upon to import a waiver of the forfeitures. There is nothing, after this, which can be set up as having that effect, but the receipt of rent by Pendleton’s agent. As for such acceptance on the part of Jones, he expressly denies that he ever received any after the purchase from Carter. The only question on this ground then, is, whether the receipt of rent by Pollard for 15. Pendleton, of the 21st of February, 1795, (or, indeed, any other receipt for rent,) could have that effect ?
It is here to be remarked, that, by Taylor’s lease, the rent was to be paid at the house of the lessor in Westmoreland county ; and can it be reasonably inferred, that the lessor knew of breaches of covenants committed, perhaps, two hundred miles off, or that he meant to release them ? Certainly not. The case of Doe ex dem. Cheuy v. Batten, Cowp. 245, shews us that the question always is, quo animo, the rent was received ; and what was the real intention of both parties ? To say that this acceptance amounted to a waiver of the forfeiture incurred by non-performance of the covenants, which were to be performed on the land, would amount to a release of such covenants in all cases, unless indeed the lessor had changed his stipulation as to the place of receiving the rents, and agreed to receive them on the premises, or had bound himself to keep an agent on or near the premises ; neither of which he has done, or was bound to do, in this case.
*On the ground then, that the mere acceptance of rent has not the effect of waiver in the case before us ; that the appellant has got the law on his side by the recovery in ejectment; and that the appellee, or those under whom he claims, have committed material wrong and injury, in relation, as well to the temporary, as the permanent interests of the inheritance, I am of opinion that the appellee is not entitled to arrest the legal title of the appellant, and that the decree should be reversed, and the bill dismissed.
FREMING, Judge.
The appellee, Roberts, came into equity to be relieved against a judgment in ejectment, upon the ground that by virtue of a contract between Mas-grove and Robert Carter, the plaintiff was entitled, as assignee of Musgrove’s heir, to a lease from the said Robert Carter; which Charles Carter, (of whom the appellant Jones purchased,) had promised to confirm; and that Charles Carter and Jones were fully apprized of his title, at the times when their respective interests in the land commenced.
Assuming, without a minute investigation of the point, that the contract is fully proved, we are to enquire into the nature of the lease contended for; and it is to be found in the copy of one of those usually granted by Robert Carter to the tenants. By which the tenant was to improve the estate by building houses, planting orchards and otherwise; and was neither to commit waste ; nor alien the lease without the consent of the lessor.
All these stipulations ought to have been strictly performed ; but the testimony shews that they have been violated in several important instances ; and the consequences of it are to be considered.
The maxim is. that he who asks equity, must do it. And if a party comes into a court of chancery for relief, he should be able to shew, that lie has done all which his adversary has a right to require as the consideration for performance on his part. Otherwise, he is not entitled to the aid of the court: and this argument is a fortiori, where *he has grossly failed to comply with his engagements to the lasting injury of his adversary ; for then the converse of the maxim takes place, namely, that he who has commiited iniquity, shall not have equity.
Apply these rules to the case before us.
The tenants here have not only failed to make several of the stipulated improvements, but have committed waste, both voluntary and permissive, contrary to the exigency of their engagements,and the dictates of justice.
It is therefore, with a very ill grace, that an assignee, without license, and one of the tortfeasors, comes into equity to ask the benefit of a contract openly violated by himself and his predecessors. It is, in effect, to demand a dispensation for the injuries, and a reward for inflicting them; and that, too, *1130 after an offer of compromise had been rejected.
I concur, therefore,, that the decree ought to be reversed, and -the bill dismissed.
Decree reversed, and the bill dismissed with costs.